IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

_____ )

UNITED STATES OF AMERICA,               )
                                        )
                                        )
                                        )
              Plaintiff,                )
                                        )
      vs.                               )    Case 2:13CR00711
                                        )
                                        )
JACOB J. KILGORE,                       )
                                        )
                 Defendant.             )
                                        )
_____)

BEFORE THE HONORABLE DAVID NUFFER

OCTOBER 8, 2015

REPORTER'S TRANSCRIPT OF PROCEEDINGS

MOTION HEARING

Reported by:  KELLY BROWN, HICKEN CSR, RPR, RMR

```
 1
 2                    A P P E A R A N C E S
 3    FOR THE PLAINTIFFS:   OFFICE OF THE US ATTORNEY
 4                          BY: JOHN W. HUBER
 5                              MARK Y. HIRATA
 6                              NIALL M. O'DONNELL
 7                          Attorneys at Law
 8                          185 SOUTH STATE, SUITE 300
 9                          Salt Lake City, Utah  84111
10
11    FOR THE DEFENDANT:    RAY QUINNEY & NEBEKER
12                          BY:  LOREN E. WEISS
13                               ERIC G. BENSON
14                               GREGORY S. OSBORNE
15                               KATHERINE B. BENSON
16                          Attorneys at Law
17                          36 SOUTH STATE ST, STE 1400
18                          SALT LAKE CITY, UTAH  84145
19
20
21
22
23
24
25
```

1          SALT LAKE CITY, UTAH, THURSDAY, OCTOBER 8, 2015

2                          *   *   *   *   *

3          THE COURT:  Good morning.  We're convened in

4     United States vs. Kilgore.  Could I ask counsel to make their

10:08:55  5     appearances for our record, please?

6          MR. HUBER:  Your Honor, good morning.  John Huber,

7     United States ATTORNEY.  Also with me today is Assistant

8     United States Attorney Mark Hirata and Special Assistant

9     United States Attorney DOJ trial attorney Niall O'Donnell.

10:09:10 10     Today at the appropriate time, I've asked Mr. Hirata to

11     represent our position.

12          THE COURT:  Thank you.

13          MR. WEISS:  Your Honor, Loren Weiss.  With me and

14     on behalf of Mr. Kilgore, as well, my colleague here Eric

10:09:21 15     Benson.  We have with us Greg Osborne, Katherine Benson and

16     the general counsel to the Ray, Quinney & Nebeker, Paul Burke.

17          THE COURT:  Thank you very much.  Counsel, I'll

18     just ask you to keep the microphone pointed at you when you're

19     speaking so that we can clearly be heard.

10:09:39 20          In connection with this hearing, I reviewed papers

21     that have been filed.  The briefing was accelerated.  I

22     appreciate counsel complying with that request.  We have had

23     time to review the original motion, the opposition, the reply

24     and the associated exhibits.

10:10:01 25          I had one question about one of the exhibits.  It's

1   Exhibit F to the -- let me find out which one -- Exhibit F to

2   the motion to dismiss, the original motion to dismiss.  And

3   it's docket Number 74-6.  Was that exhibit provided?  It was

4   the sample e-mails for in camera review, which I did review.

10:10:27   5   Was that provided with the copy served on the government?  I

6   assume not, but I wanted to be sure.

7           MR. WEISS:  No, sir, it was not.

8           THE COURT:  Okay.  Thanks.  And I did review that.

9   And the sampling was effective to show the nature of the

10:10:42   10   attorney-client privilege content both as communications and

11   work product in e-mails.  So that's significant in our

12   decision today.

13           The first thing that I wanted to do was review the

14   factual record before we go on and talk about the standards

10:10:59   15   which apply and how they apply.  The factual record that we

16   have largely consists of the declarations filed by the

17   government in its response.  We have declarations of Special

18   Agent Todd Thompson; declaration of Randy Kim, FBI special

19   agent; declaration of Kent Mortensen, special agent, also;

10:11:31   20   Sang Chung, a computer scientist; Mr. Hirata filed a

21   declaration; US Attorney's Office paralegal Erica Arviso; and

22   Special Assistant US Attorney Niall O'Donnell filed a

23   declaration.

24           I didn't see any other declarations.  Am I correct,

10:11:53   25   Mr. Hirata?

1          MR. HIRATA:  I believe you've covered them all,

2    Your Honor.

3          THE COURT:  And Mr. Weiss?

4          MR. WEISS:  I believe so, Your Honor.

10:12:00    5          THE COURT:  Okay.  In the motion to dismiss the

6    indictment, however, there are many facts recited which were

7    substantiated by either, by exhibits or I would assume are

8    uncontested, and some of these set timeframe that I think is

9    important.

10:12:19   10          First of all, the timeframe of 2010 for the

11   commencement of the government's investigation was outlined in

12   the government's opposition.  And that would be, of course,

13   the fact it was within the knowledge of the government.  Then

14   both of you recite the fact on February 8th, 2011, warrants

10:12:42   15   were executed at the Orbit facility in Salt Lake City.  And

16   that I guess would be the first awareness, direct awareness

17   that Orbit or Mr. Kilgore had of the investigation, Mr. Weiss?

18          MR. WEISS:  Your Honor, I believe there had been

19   some indication earlier than that, but that certainly is a

10:13:03   20   bright line.

21          THE COURT:  Okay.  So February 8, 2011.  And your

22   motion to dismiss, Mr. Weiss, recited that within days of the

23   searches Mr. Kilgore learned that he was a target, and then

24   Orbit promptly removed Mr. Kilgore as its CEO.  And about that

10:13:25   25   time the relationship between your firm and Mr. Kilgore began.

1          MR. WEISS:  That's correct.

2          THE COURT:  In cooperation between Mr. Kilgore and

3     Orbit and the United States Attorney's Office, all of

4     Mr. Kilgore's e-mails were provided from an internal server to

10:13:52  5     the government.  And there was a subpoena issued for

6     Mr. Kilgore's laptop computer, and Mr. Kilgore complied with

7     that producing the laptop with a message that noted that

8     confidential and privileged information had been locked into a

9     folder on the laptop labeled, privileged.

10:14:18  10          No dispute about these facts so far, Mr. Hirata?

11          MR. HIRATA:  Actually there is, Your Honor.  With

12     regard to your statement that all Mr. Kilgore's e-mails were

13     provided off his server, the defense has noted in their motion

14     that the government has possession of the entire server of

10:14:40  15     e-mails.  That's not true.  We have requested e-mails from

16     Orbit.  They have provided e-mails in response to our request.

17     Does the government know as we stand here today whether we

18     have all of Mr. Kilgore's e-mails?  I can't answer that.

19          THE COURT:  Okay.

10:14:59  20          MR. HIRATA:  And that's an important fact to the

21     government.

22          THE COURT:  And in your memorandum, you state that

23     Orbit provided what it believed to be all of Kilgore's e-mails

24     from its internal server.  So explain the difference between

10:15:15  25     what you're saying and what this says.

1          MR. HIRATA:  Well, yes.  While we would like to

2     rely on -- we dealt through Orbit's counsel.  And the

3     representation was made to us that these are the e-mails.  But

4     can I -- because we didn't have the actual server.  And just

10:15:36  5     so you know, Your Honor, it was the government's intent to

6     image the server.  However, once corporate counsel became

7     involved, we agreed to work with them and not image the entire

8     server.  We fell short of getting the entire server.  So that

9     is why I'm saying I can't represent to you that we have it

10:15:56  10    all.

11          THE COURT:  Okay.

12          MR. HIRATA:  We believe so.  But we -- there was a

13    lingering concern.

14          THE COURT:  Mr. Weiss, I think that the state of

10:16:04  15    the record according to Mr. Hirata is that there was a

16    delivery of e-mails from the Orbit server, but Mr. Hirata's

17    not in a position to verify that's all the e-mails; is that

18    correct?

19          MR. WEISS:  Well, I think that's correct, although

10:16:20  20    I didn't have time to obtain additional affidavits.  I did

21    speak with the lawyer for Orbit who was involved in that

22    production.  And all of that material was available.  All they

23    ever did was basically keep those records and provide

24    everything that the government ever asked and would always --

10:16:44  25    it was always available to them.  All they had to do is ask.

1    THE COURT:  All right.  Well, I think we understand

2    that there was a large delivery, but we have not as we all

3    stand here today confirmed if it was everything, though that

4    might be possible.

5    Another important fact is that on February 15th,

6    2011, you, Mr. Weiss, contacted government representatives and

7    informed them that you were representing Mr. Kilgore; is that

8    correct?

9    MR. WEISS:  That is correct, Your Honor.

10    THE COURT:  Any dispute about that?

11    MR. HIRATA:  No dispute.

12    THE COURT:  Okay.  Then there's also the fact that

13    the government's initial review of e-mails from the Orbit

14    server indicated that there were e-mails forwarded by

15    Mr. Kilgore from his Orbit account to a personal Gmail account

16    and that that was made apparent sometime in a review beginning

17    in February 2011, according to the government's statement of

18    facts; is that correct, Mr. Hirata?

19    MR. HIRATA:  That is correct.

20    THE COURT:  And Mr. Weiss?

21    MR. WEISS:  I have no reason to dispute that at

22    all.

23    THE COURT:  The contents of some of those e-mails

24    laid out in the government's statement of facts indicates that

25    they dealt with the subject matter of the investigation.

1        Any dispute about that, Mr. Weiss?

2        MR. WEISS:  No.  I'm sure they do.

3        THE COURT:  Then on April 12th, 2013, a search

4   warrant was executed on Google for the Kilgore Gmail account

5   to which those Orbit account e-mails had been forwarded.  That

6   warrant has been filed as an exhibit, Exhibit C, and it's a

7   sealed exhibit.  But we have not only the warrant, but the

8   application and the affidavit.

9        There's no dispute about the authenticity of the

10  document.

11       MR. WEISS:  No, sir.

12       THE COURT:  Okay.  The warrant's existence was, of

13  course, unknown to the defendant at that time.  In response to

14  the warrant, Google produced a thumb drive containing the then

15  existing contents of the Kilgore Gmail account.

16       Any dispute about those facts, Mr. Hirata?

17       MR. HIRATA:  No, Your Honor.

18       THE COURT:  Mr. Weiss?

19       MR. WEISS:  I presume so, Your Honor.

20       THE COURT:  Then we begin a fairly long -- let me

21  back up a little bit.  In 2012, there was no indictment.  In

22  fact, the date of the indictment was October 23rd, 2013.  But

23  we don't have an indictment for 2012.  But there was a

24  presentation in August 2012, a reverse proffer of the United

25  States Attorney's Office, and there was an indication that

1   indictment was intended, but it didn't happen in 2012.  And

2   that all proceeded the time of that April 2013 warrant;

3   correct, Mr. Hirata?

4            MR. HIRATA:  That's correct.

5            THE COURT:  Mr. Weiss?

6            MR. WEISS:  Yes, sir.

7            THE COURT:  The alleged scheme and Mr. Kilgore's

8   participation in Orbit had ended before the April 2013 search

9   warrant was issued; correct, Mr. Hirata?

10           MR. HIRATA:  That is correct.

11           THE COURT:  Mr. Weiss?

12           MR. WEISS:  Yes, sir.

13           THE COURT:  There are -- there is a statement in

14  the warrant that, in the affidavit requesting the warrant that

15  the affiant recognized the potential for Kilgore to be using

16  his Gmail account to communicate with his defense counsel.

17  This is laid out on Page 5 of Docket Number 63.  In a

18  precautionary effort, I'm still quoting, to mitigate the

19  government's access to potential attorney-client information,

20  I intend to have the Salt Lake Regional Computer Forensic Labs

21  do a preliminary term search for terms that would identify

22  Kilgore's defense attorney or defense firm.  I will ask the

23  RCFL to conduct a culling of e-mail communications associated

24  with these terms.  I will then ask the RCFL to provide me with

25  access to the remaining e-mail communications from Kilgore's

10

1    Gmail account.  The culled e-mails will be reviewed, culled,

2    C-U-L-L-E-D, will then be reviewed by a designated taint team.

3         Now, I read that into the record.  It appears in

4    the motion to dismiss, but it also to my knowledge appears

10:22:15  5    only in the affidavit, which still is filed in this record

6    under seal.  Is that right, Mr. Hirata?

7         MR. HIRATA:  Are you referring to the Google search

8    warrant, Your Honor?

9         THE COURT:  Yes.

10:22:24  10         MR. HIRATA:  It has been unsealed.

11         THE COURT:  It has been?

12         MR. HIRATA:  The entire case for that search

13    warrant has been unsealed.

14         THE COURT:  So why in this record is the warrant a

10:22:33  15    sealed exhibit?  It shouldn't be, should it?

16         MR. BENSON:  No, Your Honor.  I think that the

17    materials just for ease of the attachments were sealed in a

18    wholesale fashion.  But we move to unseal that if there's no

19    objection from the government.

10:22:47  20         THE COURT:  Well, let's figure this out when we're

21    talking about it, because our record should be as public as

22    possible.  Exhibit A to the motion is a letter from Mr. Weiss

23    to the US Attorney's Office dated July 20th, 2011.  Any reason

24    that should be sealed?

10:23:08  25         MR. BENSON:  Your Honor, there is a privileged log

11

1    which is attached to that letter, I believe, if I remember the

2    exhibits correctly, and we would request that remain under

3    seal as it contains certain terms regarding the

4    attorney-client privilege.  Otherwise, no reason.

10:23:23    5             THE COURT:  Mr. Hirata, any reason the letter

6    should not be unsealed?

7             MR. HIRATA:  No, Your Honor.

8             THE COURT:  Okay.  So the letter is Exhibit A.  It

9    should be unsealed.  I'll ask you, Mr. Benson, or, Mr. Weiss,

10:23:39   10    to file an unsealed copy.  Exhibit B, the privileged log will

11    remain sealed.  Exhibit C, the warrant application and

12    affidavit, should be unsealed; correct?

13             MR. BENSON:  No, objection, Your Honor.

14             THE COURT:  Okay.  File an unsealed copy in this

10:23:56   15    case.  The Exhibit D, the copies of the covers of the CDs, no

16    reason that should be sealed.

17             MR. BENSON:  No objection.

18             THE COURT:  Exhibit E, a second certificate of

19    compliance and request for reciprocal discovery originally

10:24:18   20    filed not under seal in this case is Docket Number 17.  It may

21    as well be unsealed here, as well.

22             MR. BENSON:  Yes, sir.

23             THE COURT:  Exhibit F, an e-mail -- this is the

24    series of e-mails that was submitted only for my in camera

10:24:37   25    review that would contain attorney-client privileged

12

1    information.  Those should remain sealed.

2              MR. BENSON:  Yes, sir.

3              THE COURT:  Exhibit G, discovery index, dated

4    March 13th, 2014.  Should that be sealed or not?

10:24:51  5              MR. BENSON:  No objection to unsealing.

6              THE COURT:  Mr. Hirata?

7              MR. HIRATA:  That's fine, Your Honor.

8              THE COURT:  Exhibit G will be unsealed.

9    So, Mr. Benson, if you'll take care of filing the ones that

10:25:02  10    should not be sealed.

11              MR. BENSON:  Yes, Your Honor.

12              THE COURT:  We'll get that cleared up.

13              Now, as far as the actual process at the

14    Intermountain West Regional Forensic Computer Lab, that is

10:25:22  15    outlined in Paragraphs 5 through 17 of the government's

16    opposition, and it's supported by various declarations.  It

17    outlines the initial review and filtering, the filtering

18    terms, the discovery after filtering of an e-mail from an

19    individual named Mark -- Mike Hargraves, which appear to be an

10:26:00  20    interview report suggesting that Hargraves was an investigator

21    for the defense.  And then a renewed request for additional

22    filtering two weeks after the additional -- after the original

23    filtering.  And then upload of the data into the FBI's BIDMAS,

24    B-I-D-M-A-S, system, the document management and analysis

10:26:32  25    system.

1          And apparently, at that stage, if I'm reading

2    correctly, and the defense noted this in their reply memo in a

3    footnote, any filtering done before uploading into BIDMAS, any

4    filtering done before that is lost when there's uploading into

10:26:49  5    BIDMAS.  Is that right, Mr. Hirata?

6          MR. HIRATA:  I'm sorry.  Would you receipt the

7    question, Your Honor?

8          THE COURT:  It appears to me that the first two

9    filterings, May 8th and May 20th, 2013, before the upload into

10:27:02 10    BIDMAS on May 28th, 2013, that those filterings did not

11    transfer into BIDMAS.

12          MR. HIRATA:  Oh, yes.  That is correct.  So all of

13    the efforts by the IWRSFL to filter was not preserved when the

14    Gmail account was uploaded to BIDMAS.

10:27:20 15          THE COURT:  Okay.

16          MR. HIRATA:  That's what led to the filtering

17    through BIDMAS.

18          THE COURT:  And then the BIDMAS filtering is

19    outlined at Page 11, Paragraph 11.  And access to the BIDMAS

10:27:35 20    system is outlined on Paragraphs 12 and 13 and 14.  The

21    Paragraph 16 contains the important fact that on December 16,

22    2013, Mr. Hirata requested Special Agent Thompson to confirm

23    that the Kilgore Gmail account had been filtered for

24    privilege.  Special Agent Thompson then did a search for terms

10:28:10 25    Hargraves, Weiss or Benson.  And in spite of the prior

14

1    filtering, the search appeared to result in 1,317 items.  And

2    two more identical searches were run by Agent Thompson, and

3    each confirmed the 1317 results.

4            Then on December 16, 2013, and 17, 2013, there was

10:28:47  5    an additional filtering on BIDMAS, additional terms were

6    added, and all of the items associated with the terms Weiss,

7    Benson, Ray Quinney & Nebeker, Hargraves, RQN, e-mail address

8    mik1313 and mschultz were transferred to a folder potentially

9    privileged material.

10:29:16 10           Now, Mr. Weiss, I know you don't have access to the

11    process of the items in IWRCFL, but do you dispute the facts

12    as they're laid out by the government?

13           MR. WEISS:  I have no reason to, Your Honor.  None

14    at all.

10:29:36 15           THE COURT:  Then we come to the point in

16    Paragraph 18 of the government's statement where there was

17    production to the defense.

18           MR. HIRATA:  Excuse me, Your Honor.

19           THE COURT:  Yeah.

10:29:44 20           MR. HIRATA:  Pardon the interruption.

21           THE COURT:  No, that's fine.

22           MR. HIRATA:  I'd just like to make a clarification

23    that when the second filtering was run by Ms. Holloway as

24    identified in Paragraph 17 pouring onto Page 15, when she ran

10:30:04 25    that second filtering, she reconfirmed that the items that she

1    pulled had previously been transferred into the potentially

2    privileged items folder.  And so that refers back to the

3    efforts of Sang Chung.  I just wanted to clarify that for the

4    record so you're clear on that.

10:30:27   5         THE COURT:  Well, the statement of facts doesn't

6    say previously.  It says they had been transferred, and maybe

7    that means past tense.  You're referring to the declaration

8    of --

9         MR. HIRATA:  Sang Chung.  If you go to Paragraph 11

10:30:48   10   of his declaration, Your Honor.

11        THE COURT:  So the December 17th search was a

12   confirmation that the transfer had been effective --

13        MR. HIRATA:  On July 2nd.

14        THE COURT:  -- on July 2nd --

10:31:04   15        MR. HIRATA:  That's correct.

16        THE COURT:  -- in BIDMAS.  Just a minute.

17        (Time lapse.)

18        THE COURT:  Well, then what was the significance of

19   adding additional search terms on December 17?

10:31:22   20        MR. HIRATA:  That was something as Agent Thompson

21   explained in his declaration while he had had a general

22   recollection for having the filter done in the first place in

23   July, when I asked him to check to confirm, he ran the terms,

24   anyway, and that's why to his surprise when he saw the items.

10:31:46   25   He didn't recall, again he generally recalled, but in response

16

1    to that situation, that scenario, he then requested the second

2    filtering be done.

3            Judge, there's one additional point of

4    clarification that ought to be made.  Following the loading of

10:32:05  5    the Kilgore Gmail account on July 2nd, there were additional

6    items of evidence that were also loaded onto the BIDMAS.  So

7    the search that Agent Thompson ran on December 16th not only

8    included the Kilgore Gmail account, but additional items that

9    had been loaded onto BIDMAS, which I will represent for the

10:32:33 10    record also included additional e-mails that Orbit had

11    provided to the government.

12            THE COURT:  So when were those first filtered out?

13            MR. HIRATA:  The --

14            THE COURT:  Those additional items added after

10:32:45 15    July 2.

16            MR. HIRATA:  Well, if you look at the sealed

17    addendum, Exhibit A --

18            THE COURT:  Right.

19            MR. HIRATA:  -- and if you go to Page 5 --

10:33:09 20            THE COURT:  Okay.

21            MR. HIRATA:  -- and you will see that on Line 181

22    on August 24th, you see those additional search terms, Your

23    Honor?

24            THE COURT:  Uh-huh (affirmative).

10:33:20 25            MR. HIRATA:  That is an additional search that was

17

1    run when the e-mails from Orbit were uploaded to Google -- to

2    BIDMAS, excuse me.

3           Now, understand, Your Honor, that those search

4    terms, so if Benson, any witness last name Benson or first

10:33:47    5    name Benson, all of those -- anything's going to be caught in

6    those searches.  So I think it's also important to note that

7    it's reasonable to conclude that every single item that has

8    been pulled by these various searches that have been discussed

9    in the government's briefs and commented on by the defense do

10:34:10   10    not necessarily, did not necessarily pull up privileged

11    communications between Mr. Kilgore and his counsel.  There are

12    additional items that were also a part of that mix.

13           THE COURT:  Segregated items may not have been

14    privileged, you're saying.

10:34:30   15           MR. HIRATA:  That's right.  Some of those items.

16           THE COURT:  Let's go back here, though.  I want to

17    make sure I understand.  The first BIDMAS filtering was on

18    July 2nd?

19           MR. HIRATA:  That's correct.

10:34:38   20           THE COURT:  And then there had to be refiltering as

21    additional material was added to the database.

22           MR. HIRATA:  That was on August 24th.

23           THE COURT:  And on December 17th, I'm going to ask

24    you to look at Page 15 of your memo, it says, Special Agent

10:34:56   25    Thompson also requested Ms. Holloway to add the following

1    terms to filter out.

2            MR. HIRATA:  Right.  And I apologize if I'm being

3    unclear, Your Honor.  But Agent Thompson, while though he

4    generally recalled it had already been done, once he saw these

10:35:14  5    items come up he went ahead and had that second filter done.

6    So he provided Ms. Holloway with those terms to conduct

7    another filter, which led to again the confirmation that those

8    items had previously been transferred out by Sang Chung on

9    July 2nd.

10:35:34  10            THE COURT:  On December 16th additional terms

11    Hargraves, Weiss or Benson or RQN were added to the BIDMAS

12    segregation resulting in an additional 1,317 items.

13    Previously only the full name Larry Weiss or full name Eric

14    Benson or domain name rqn.com or full name Mark Hargraves had

10:35:59  15    been used.

16            MR. HIRATA:  I'm sorry, Your Honor.  Where are you

17    reading from?

18            THE COURT:  Your motion, Page 14, Paragraph 16.

19            MR. HIRATA:  Okay.

10:36:07  20            THE COURT:  I want to make sure I understand how

21    the filtering works.  You're saying on December 16th,

22    Hargraves, Weiss, Benson or RQN were added to the business

23    segregation search.

24            MR. HIRATA:  No.  No.  That paragraph, 16, refers

10:36:22  25    to a search that Agent Thompson ran in response to my request

1    to him to confirm that --

2              THE COURT:  Okay.  So he searched those terms, and

3    it resulted in 1317 items.

4              MR. HIRATA:  That's correct.

10:36:43  5         THE COURT:  And turn back to July 11.  The July 2nd

6    business filtering did not include only the name Weiss.  It

7    had Larry Weiss.

8              MR. HIRATA:  That's right.  But Mr. Chung has

9    confirmed, and if you look at his declaration, Paragraph 5,

10:37:11  10   Your Honor.

11             THE COURT:  Uh-huh (affirmative).

12             MR. HIRATA:  Page 3.  All items featuring the above

13   terms and e-mail addresses in whatever combination, for

14   example, Larry Weiss would also include Weiss Larry, wherever

10:37:25  15   they appeared in an item in the to line, from line, subject

16   line or body of the e-mail were captured or transferred to a

17   folder for potentially privileged items.

18             So any time Mr. Weiss' e-mail address appeared in

19   the to line, in the from line, in any of the cc. lines, in the

10:37:39  20   subject line or in the body of the e-mail, those were filtered

21   out.

22             THE COURT:  Why on September 16th did the search

23   result in finding additional items on the name Weiss, for

24   example?  Is it because the system doesn't search for the

10:38:00  25   isolated name Weiss?  Your example is Mr. Chung's example is

1    Larry Weiss would also search out Weiss Larry.  Does it not

2    search Weiss?

3              MR. HIRATA:  It does.

4              THE COURT:  Why didn't the search on December 16th

10:38:18  5  reveal more items?

6              MR. HIRATA:  Judge, we have asked Mr. Chung, can he

7    recreate what happened when Agent Thompson ran that search.

8    He is unable to do so.  So as to those 1317 items, we can't

9    provide the Court with more information other than those items

10:38:33 10  were identified.  Agent Thompson didn't look at any of those

11   items.  It led to the second filtering that was done.  That's

12   all we are in a position to provide, Your Honor.

13             THE COURT:  Does Exhibit A, the sealed witness log,

14   reveal this December 16th search?

10:38:50 15            MR. HIRATA:  It does.

16             THE COURT:  Where?

17             MR. HIRATA:  If you go to -- now, which search?

18   Are you referring to Agent Thompson's search?

19             THE COURT:  Right.

10:39:00 20            MR. HIRATA:  Okay.

21             THE COURT:  On Paragraph 16.  Where is that search

22   reflected?

23             MR. HIRATA:  If you go to Page 32, and if you look

24   at Lines 1303, 1304 and 1306.

10:39:13 25            THE COURT:  Give me just a minute to get there.

1           MR. HIRATA:  All right.

2           (Time lapse.)

3           MR. HIRATA:  Those are the three searches that

4    Agent Thompson ran.  And as you can see they're minutes apart

10:39:27  5    on December 16th, starting at, and this is eastern time, 3:35,

6    3:38 and 3:44.

7           THE COURT:  So do I understand that at that time

8    from the database there were 449,839 documents?

9           MR. HIRATA:  Items.

10:39:50  10           THE COURT:  Sorry?

11           MR. HIRATA:  Items.

12           THE COURT:  Items, yeah.

13           MR. HIRATA:  That's correct.

14           THE COURT:  And then he ran this search for Weiss,

10:39:58  15    Hargraves, Benson, RQN three times at 5:35, 5:38 and 5:44, and

16    each time he yielded 1,317 items.

17           MR. HIRATA:  You're right.  It is 5:00.  That's

18    correct.

19           THE COURT:  Okay.

10:40:16  20           Any questions about that interchange, Mr. Weiss?

21           MR. WEISS:  No, sir.

22           THE COURT:  The provision of the Kilgore Gmail

23    account to defense in discovery is treated in Paragraph 18.

24    That on January 27, 2014, Special Agent Thompson had delivered

10:40:43  25    two CDs containing the Kilgore Gmail account.  He delivered

1    those to the paralegal to the US Attorney's Office.  On

2    January 28th, a paralegal from Ray, Quinney & Nebeker signed

3    for it and picked up the packet of discovery, which included

4    the two copied CDs.  The original CDs that contained Kilgore

10:41:04  5    Gmail account were delivered back to Special Agent Thompson,

6    but copies of the two CDs containing the material provided in

7    the discovery were delivered to the defendant -- were retained

8    in an office filing cabinet.

9            The facts and declarations continue that at no time

10:41:25  10   did Ms. Arviso open or review any materials in the Gmail

11   account.  And in Paragraph 19, that neither Mr. Hirata,

12   Mr. O'Donnell, the US Attorney's Office paralegal have access

13   to review any privileged communications of the defendant.

14           Now, I want to understand.  The two copied CDs were

10:41:56  15   verbatim what was on the Gmail thumb drive.

16           MR. HIRATA:  That's correct.

17           THE COURT:  Okay.  No filtering.

18           MR. HIRATA:  No filtering.

19           THE COURT:  With regard to the rest of the

10:42:09  20   discovery provided to defendants, was that also unfiltered?

21           MR. HIRATA:  Yes.

22           THE COURT:  Okay.  So Mr. Weiss says in his

23   memorandum that the government is providing more than 540,000

24   pages in discovery, and of that discovery, 71,665 pages

10:42:33  25   consisted of e-mails from the Gmail account.

1          Does that seem accurate to you?

2          MR. HIRATA:  I must admit, I am -- I can't confirm

3     the accuracy of that representation.

4          THE COURT:  But if you have no reason to dispute

10:42:48  5     it, I'm going to take it.

6          MR. HIRATA:  I have no reason to dispute it.

7          THE COURT:  And your statement, Mr. Weiss, is that

8     buried within the e-mails in the Gmail account were e-mails

9     with defense counsel including e-mails discussing trial and

10:43:03 10    defense strategy with you, with other RQN lawyers and that

11    they were not separated from the rest of the documents in the

12    production but were spread throughout the entire file; is that

13    correct?

14         MR. WEISS:  That is correct, Your Honor.

10:43:17 15    THE COURT:  And do you mean by the entire file, the

16    entire two CDs containing the Gmail account?

17         MR. WEISS:  Yes, sir.

18         THE COURT:  Okay.  Now, if I understand it, then,

19    the circumstances that we're in is that privileged e-mails

10:43:37 20    were in the possession of the special agents of the FBI.  They

21    were attempted to be segregated out before uploading to

22    BIDMAS, then there was an attempt to segregate them while in

23    BIDMAS.  There was an additional search that revealed that the

24    attempted segregation in July had not been effective.  That

10:44:02 25    was determined in December.  But regardless, the entire body

1    of Gmail was delivered to defense counsel and never reviewed

2    by attorneys or paralegals at the US Attorney's Office.

3              Is that your position, Mr. Hirata?

4              MR. HIRATA:  Judge, I just need to differ with you

10:44:28  5    on one point that you just made.  You noted that the December

6    search established that the July search, and I'll be more

7    specific, that the December 17th filtering established that

8    the July 2nd filtering was ineffective.

9              THE COURT:  Right.

10:44:49 10              MR. HIRATA:  We respectfully disagree.  As Mr. Sang

11   Chung has confirmed, the privileged items that he had already

12   put into that potentially privileged folder were the same

13   items that Ms. Holloway identified in on December 17th.  So it

14   didn't establish that it was ineffective.  It reconfirmed that

10:45:13 15   it was effective.

16              THE COURT:  Well, I am not understanding.  So I'm

17   glad you called this to my attention.

18              MR. HIRATA:  Okay.

19              THE COURT:  Could you pull that mike over to where

10:45:22 20   you're standing.

21              Let me go back to your statement.  This is

22   Paragraph 16 of your motion -- or your opposition.  Are you

23   saying that the search run on December 16th was a search of

24   the privileged file?

10:45:58 25              MR. HIRATA:  No.  What I am saying is that the

25

1    search run by Ms. Holloway on the -- actually it's not on the

2    16th.  The 16th is Agent Thompson's search.

3                   THE COURT:  Right.

4                   MR. HIRATA:  Is that what you're asking me?

10:46:12  5         THE COURT:  I am.

6                   MR. HIRATA:  Okay.  That search is of the

7    unfiltered items.

8                   THE COURT:  Okay.

9                   MR. HIRATA:  Okay.  The search that was run on the

10:46:23  10   17th was the search of the entire BIDMAS database.  And the

11   items that Ms. Holloway identified to be put into the

12   privileged folder had already previously been done so by Sang

13   Chung.  That's why I'm simply saying that the search that she

14   ran identified privileged items was simply a confirmation that

10:46:47  15   on July 2nd Mr. Chung had successfully already removed those

16   items to the potentially privileged items folder.

17                  THE COURT:  Okay.  Go with me to December 16,

18   Paragraph 16.  That's a search of the material that had not

19   been culled and segregated into the privilege folder.

10:47:06  20        MR. HIRATA:  That's correct.

21                  THE COURT:  And it revealed 1,317 potentially

22   privileged items.

23                  MR. HIRATA:  Correct.

24                  THE COURT:  Why?

10:47:14  25        MR. HIRATA:  As I've explained to you, Your Honor,

1    we're not able to go back and recreate that.  I don't know

2    what those items are, those 1317.  What I can only say is that

3    there were additional items that were put into the BIDMAS

4    system following the uploading of the Gmail account, one; two,

10:47:37    5    we are -- we are simply not in a position to give you any more

6    information other than there are 1317 items identified.  We've

7    asked Mr. Chung if he could replicate that, and he said he is

8    unable to do so.

9         THE COURT:  My point was in saying that the

10:47:56   10    July 2nd search was ineffective is that it seems to have been

11    ineffective because on December 16th, the search for

12    Hargraves, Weiss, Benson and RQN revealed an additional 1300

13    items.  To me that means ineffective.

14         MR. HIRATA:  Okay.  If that's what you mean, Your

10:48:14   15    Honor, I don't disagree with you so long as we have an

16    understanding that items that have been searched by Mr. Chung

17    on July 2nd, privileged items had already been put into the

18    folder.

19         THE COURT:  Right.

10:48:29   20         MR. HIRATA:  And that the 1317 items did not

21    include that that had already been placed into that folder.

22         THE COURT:  Okay.

23         MR. HIRATA:  With that clarification, I will agree

24    with you that it was at some level ineffective.

10:48:43   25         THE COURT:  And maybe I'm not saying that that

1    July 2nd search was ineffective, but it certainly did not

2    result in segregation of all privileged items, perhaps because

3    of additional material being added.  But the July 2nd

4    segregation did not effectively segregate, that was not the

10:49:02   5    last time things had to be segregated out of BIDMAS.

6              MR. HIRATA:  Okay.

7              THE COURT:  And done again on December 16th.

8              MR. HIRATA:  It concerns me that you're referring

9    to all of these items as privileged items because, again, Your

10:49:16  10   Honor --

11             THE COURT:  Potentially privileged.

12             MR. HIRATA:  For a witness named Benson.

13             THE COURT:  Sure.  I understand that.

14             MR. HIRATA:  Okay.  Well, then I'm not going to

10:49:27  15   quarrel with you on that issue.

16             THE COURT:  Okay.  Thanks.

17             Then it's my understanding, Mr. Weiss, that defense

18   counsel discovered the presence of the potentially privileged

19   items and actual privileged items in September of this year.

10:49:44  20             MR. WEISS:  That's correct, Your Honor.

21             THE COURT:  So the discovery was delivered to you

22   in January of 2014, and about 21 months later in September

23   that came to your attention.

24             MR. WEISS:  That's correct.

10:49:57  25             THE COURT:  Okay.

1          MR. WEISS:  And I can explain that, as well, Your

2     Honor.

3          THE COURT:  Sure.

4          MR. WEISS:  The information that was provided to us

10:50:02  5     was in native format and unsearchable.  We went around and

6     around with the government about what format it should have

7     been provided in.  Finally we converted it and downloaded it

8     into Concordance, which we use in the office.  And when we

9     search documents with search terms we used, we put limits on

10:50:24 10     those searches with respect to the timeframe of the

11     allegations in the indictment concluding in early 2011.  And

12     so they didn't show up on search terms because we had limited

13     it.

14          THE COURT:  That's another one of your points, is

10:50:42 15     that all of this Gmail is after the time period --

16          MR. WEISS:  Correct.

17          THE COURT:  -- of the activity alleged in the

18     indictment.

19          MR. WEISS:  Correct.

10:50:49 20          THE COURT:  Okay.

21          MR. WEISS:  And just to cover a couple of months

22     before trial, we asked for searches looking for something, and

23     serendipitously, the timeframe was left off the search terms,

24     and these all popped up.  That's how we came to find them.

10:51:09 25          MR. HIRATA:  Your Honor, may I clarify?

1          THE COURT:  Yeah.

2          MR. HIRATA:  When we provided those two CDs to

3    Mr. Weiss, there was no problem in accessing, opening those

4    files.  They have noted that we buried those e-mails in among

10:51:26  5    many other e-mails.  That's not true.  On two discretely

6    identified CDs, the Gmail account was identified.  Our

7    paralegal simply copied what Gmail had provided.  Those could

8    be opened, it could be reviewed, when we provided them in

9    January of 2014.  It is not accurate to suggest that there

10:51:52  10   were these difficulties that led to a review 21 months later.

11         THE COURT:  So why, Mr. Hirata, did your office not

12   access them?

13         MR. HIRATA:  There was no need to.

14         THE COURT:  Because?

10:52:03  15        MR. HIRATA:  Because we had already conducted the

16   filtering.  Agents had already run terms.  We had selected

17   e-mails, e-mails that we intend to use as exhibits at trial.

18   There was no reason -- first of all, in fact, I should make

19   this additional clarification, Your Honor.  It didn't even

10:52:24  20   occur to me that Ms. Arviso had in her drawer those copies of

21   those two CDs.  I did not have the good sense to tell her when

22   she received the Gmail, the hard drive in the form of two CDs

23   from Agent Thompson, look, take this, copy it, send it over to

24   the defense and don't retain copies of it.  I didn't have the

10:52:52  25   good sense to tell her that.  She, simply following her usual

1    protocol, kept a copy in a drawer in a folder.  She never

2    accessed that folder throughout that entire time period they

3    were there.  I did not, nor did my co-counsel, nor did anyone

4    else at the US Attorney's Office, to my knowledge.  And again,

10:53:13   5    as I've just explained, there was no need to.

6           Now, after I met with Mr. Weiss and Mr. Benson, it

7    then occurred to me that we had provided everything.  That I

8    knew, the entire Gmail account, right, including the

9    unfiltered e-mails.  That then caused me to come back to

10:53:33   10   Ms. Arviso and ask her, so did you retain a copy of the two

11   CDs that you provided to the defense?  She acknowledged she

12   did.  In response to me learning that situation, I said, you

13   are to return those CDs to the FBI.  Agent Thompson has taken

14   possession, custody of those CDs.  He has put those in

10:53:58   15   evidence.  I'll also confirm for the Court that there is a

16   separate segregated place where those -- where the thumb drive

17   and the copies are being kept.  There has been a separate

18   agent that is walled off from this case who is assigned to

19   that evidence so that if anyone desires access to that

10:54:17   20   original evidence, they must go through that agent.

21           THE COURT:  Who is it?

22           MR. HIRATA:  Steven Domer (sic).  He's with the

23   Salt Lake City FBI office.

24           THE COURT:  I haven't seen that fact reflected in

10:54:36   25   the paperwork.

1    MR. HIRATA:  No.  And my apologies, Your Honor.

2    But that is, that is what has been done.

3    THE COURT:  When was he designated?

4    UNIDENTIFIED SPEAKER:  Within the last week.

10:54:51  5    THE COURT:  Let's go to this issue that I had,

6    Mr. Hirata, the sentence that I quoted in the affidavit

7    supporting the search warrant indicates that there would be a

8    taint team.  The provisions of the search warrant were

9    remarkably sparse, I think, in what would be done, what

10:55:07  10   procedure would be followed by the taint team.  There was a

11   discussion that there would be review and filtering.  Let me

12   go back to the application in Paragraph 19.

13        I intend to have a preliminary term search done.

14   They'll conduct a culling.  I will ask RCFL to provide me with

10:55:40  15   the remaining communications.  The culled e-mails will then be

16   reviewed by a designated taint team.

17        And that's all we have.  What does it mean?

18        MR. HIRATA:  Well, just what it says, Your Honor.

19   That with regard to the culled e-mails that a taint team would

10:55:59  20   then review it.  I will represent for the record we didn't

21   assemble a taint team to review the culled e-mails, and the

22   reason is very simple.  We had no interest in all of those

23   culled e-mails.  We continue to not have an interest in any of

24   those culled e-mails.  That is why a separate taint team was

10:56:20  25   not necessary to be assembled to look at those e-mails to

1    determine if, in fact, they are privileged and whether that

2    needed to be litigated.  We did not go down that road.  We

3    didn't assemble that team because we had no interest in

4    reviewing or using any of those items.

10:56:34  5         THE COURT:  So if I understand the process, you

6    used a fairly broad keyword search with names to segregate

7    potentially privileged e-mails, and there has been no effort

8    at the US Attorney's Office to get into that folder with

9    potentially privileged e-mails.

10:56:52  10        MR. HIRATA:  No.

11        THE COURT:  The keyword search was determined by

12   whom?  Who specified the words?

13        MR. HIRATA:  Agent Thompson.

14        THE COURT:  Is Agent Thompson a lawyer?

10:57:07  15        MR. HIRATA:  No.  But he was working in conjunction

16   with me.

17        THE COURT:  Did you specify keywords?

18        MR. HIRATA:  I identified for him the lawyers that

19   were involved, and I asked him that we need to do what we can

10:57:21  20   to identify the appropriate terms that will identify the

21   e-mails that would be going from Mr. Kilgore to Mr. Weiss.

22   And, in fact, if you look at the two CDs that I've never seen,

23   but that Agent Kim provided to the defense two weeks ago, week

24   and a half ago, all of those items, those are the 407 items

10:57:53  25   that are identified in Agent Kim's declaration, it's based on

33

1   those searches that those items were identified.  And while

2   I've never seen those items, I would -- I believe that those

3   include all of the e-mails that Mr. Weiss and Mr. Benson

4   showed me in that conference room two days before they filed

5   their motion and said, look at all of these privileged

6   e-mails.  If the items that were on those two CDs did not

7   include what was in those binders, we'd be hearing about it.

8          So all I can say is that, yes, those are the terms

9   that we used as laid out in Agent Thompson's affidavit

10  declaration, worked it in conjunction with me.  In the

11  government's review we were successful in identifying the

12  privileged e-mails.

13         THE COURT:  Now, by the time the BIDMAS filtering

14  was done in July of 2013, do we have the indictment in the

15  case?  You certainly knew Mr. Weiss was involved.

16         MR. HIRATA:  Yes.

17         THE COURT:  The indictment followed by four more

18  months, didn't it?

19         MR. HIRATA:  October of 2013.

20         THE COURT:  Was there any thought or is there any

21  usual practice involving defense counsel in identifying terms

22  for a privileged screen?

23         MR. HIRATA:  We did not use, involve defense

24  counsel, Your Honor.  We didn't believe it was necessary.  We

25  didn't believe it was necessary because we knew the counsel

1    that had been identified.  We knew that we would be

2    identifying search terms, and, in fact, the proof is in the

3    pudding, Your Honor.  We believe we were successful

4    irrespective whether or not we included Mr. Weiss.  Now he has

10:59:35  5    in his brief and in his motion, he's noted that there is a

6    recommendation that requires the government to work in

7    consultation with the defense.  And that's simply not true.

8    He's cited to the ESI discovery recommendation.  That pertains

9    to discovery.  And to the extent that the privilege arises,

10:59:57  10    the issue arises in the context of providing discovery,

11    consultation with defense counsel is recommended.  This

12    doesn't apply to the conducting of a search warrant wherein

13    potentially privileged communications may occur.

14            It's a long way of answering your question that,

11:00:15  15    no, we did not consult with Mr. Weiss.  No, we didn't think

16    about consulting with Mr. Weiss because we simply didn't

17    believe it was necessary.  And we believe we were successful

18    without the benefit of Mr. Weiss.

19            THE COURT:  Why do you believe you were successful?

11:00:30  20            MR. HIRATA:  Because we haven't seen any privileged

21    communications.

22            THE COURT:  In the --

23            MR. HIRATA:  In anything.

24            THE COURT:  In the remaining BIDMAS material.

11:00:39  25            MR. HIRATA:  Correct.

1          THE COURT:  And, of course, defense doesn't have

2     access to the BIDMAS database, so they don't know what's

3     segregated and what's not; correct?

4          MR. HIRATA:  That's correct.

11:00:50  5          THE COURT:  Okay.  Mr. Weiss, what's your position

6     on the process that should have been followed given the

7     language in the affidavit?

8          MR. WEISS:  Well, at the very least, Your Honor,

9     there should have been a taint team established.  That's what

11:01:06 10    they told Judge Warner they were going to do in order to get

11    that warrant.  I am -- the government has no choice but to

12    say, we didn't read any of this.  We didn't look at any of

13    this.  But they've had access for years.  And the fact is that

14    there should be a procedure in place that's objective where we

11:01:30 15    don't need to rely on the government saying, I didn't look.

16          I also think it's interesting that somehow this

17    conversation in December of 2013 comes about with the agent

18    who is the case agent in the case who's had this material for

19    months and months and months at that point, that conversation

11:01:51 20    comes not out of thin air, but because the affidavits talk

21    about reading, looking at digesting.  Even the agents can't

22    say that, of course, because they admit that they read some

23    stuff.

24          But there was a conversation that brought the topic

11:02:09 25    up.  Something happened, and that's the problem, is that the

1    case agent and his investigative team had access.  They saw

2    some documents, and they've talked about it.  That's what a

3    taint is.  It seeps in, and this material was not reviewed.

4    It would have been a simple thing after the Gmail account is

11:02:32  5    delivered, a simple telephone call.  We would have gone over.

6    We would have run our search terms.  We would have identified

7    all of this, and we wouldn't be here today.  But the

8    government didn't even do what they told Judge Warner they

9    were going to do, and instead we're here because they've had

11:02:50  10    the information and they've had access to the information.

11    And the fact that they say that they didn't read it, of course

12    I believe them.

13            THE COURT:  The application indicates that there

14    would be a preliminary term search, a culling of the e-mail,

11:03:04  15    and then the culled e-mails would then be reviewed by a

16    designated taint team.  Mr. Hirata is saying there's been no

17    effort to review the culled e-mails, so under this process

18    would a taint team really be necessary?

19            MR. WEISS:  Well, if there had been a taint team in

11:03:20  20    place they would have called, because the recommendation is,

21    my experience is with taint teams they call you.  They know

22    who we are.  We've been involved for quite sometime at that

23    point.  And the inquiry would have been made.  And both culled

24    material and un-culled material would have had the benefit of

11:03:39  25    defense input with respect to search terms and review of

1    documents.

2           There's been no mention, but we have reason to

3    suspect there's other privileged material there that wasn't

4    culled with communication with business lawyers who were doing

11:03:52  5    work unrelated to this matter.  But it's still the access and

6    the availability of the information is offensive to the

7    attorney-client relationship.  It has a hugely chilling

8    effect.  That's our position.

9           THE COURT:  I understand your position.  I want to

11:04:11 10    move on to the law in a minute.  I've got some more factual

11    questions.

12           What's the legitimate law enforcement purpose,

13    Mr. Hirata, in issuing the warrant or the Gmail server?  The

14    investigation had been undergoing for a long time.

11:04:33 15    Mr. Kilgore was out of Orbit by this time.  So one of the

16    questions under the case law is, is there a legitimate law

17    enforcement purpose?  What is it?

18           MR. HIRATA:  To ensure we got everything.  To

19    ensure we got all of the e-mails that Mr. Kilgore sent from

11:04:51 20    his Orbit account to his Gmail account, which by the way,

21    Judge, in and of itself has evidentiary value to the

22    government.  The fact that that e-mail meant something to him

23    and he sent through his Gmail account, that in and of itself

24    at least in the government's view has evidentiary value.  We

11:05:13 25    didn't know, as I noted earlier, whether we got everything.

1          THE COURT:  But those e-mails that were forwarded

2     were back in 2010 and '11, weren't they?  2010, 2009 --

3          MR. HIRATA:  You mean the e-mails that were

4     actually forwarded, the date that those e-mails occurred?

11:05:30  5          THE COURT:  Yeah.

6          MR. HIRATA:  Yeah.  In 2009, 2010, part of 2011.

7          THE COURT:  But then you go in and get a warrant

8     that seeks all e-mail in the Gmail account regardless of date.

9     It doesn't screen from the time that he would have been

11:05:46  10    forwarding.  It screens even -- you're getting information

11    even after he left Orbit.  Couldn't have been forwarding

12    information.  I'm trying to figure out, what's the legitimate

13    law enforcement purpose in that, because that seems to be a

14    critical time for communicating with counsel?

11:06:04  15         MR. HIRATA:  Is your question going to the scope of

16    the warrant?

17         THE COURT:  Right.

18         MR. HIRATA:  Well, let's look at the items.  Let's

19    look at the items in the order.  If I may have just a moment,

11:06:28  20    Your Honor?

21         THE COURT:  Sure.

22         (Time lapse.)

23         THE COURT:  This is Attachment A.

24         MR. HIRATA:  If you look at the items, Judge,

11:06:46  25    Attachment B.

1          THE COURT:  Okay.

2          MR. HIRATA:  In particular, Page 2 under

3    Roman Numeral II of the information, can be seized by the

4    government.

11:06:59   5          THE COURT:  You just took me off.

6          THE CLERK:  I was trying to get the big screen on.

7    That explains if it blinks at you.

8          THE COURT:  Okay.

9          MR. HIRATA:  That's the scope of what we were

11:07:12  10    looking for.  Communications with current or former Orbit

11    employees concerning, and it identifies Items 1, 2 and 3.

12          When Gmail provided the information, it noted that

13    it needed -- it needed to provide us with everything.  With

14    regard to the scope of what we were looking at, staying true,

11:07:46  15    staying true to these items that are -- excuse me -- these

16    communications that are referred to in Roman Numeral IIa,

17    that's how we governed ourselves in running searches of that

18    Gmail account and those e-mails.  And we were able to identify

19    many e-mails that Orbit had already provided us that went to

11:08:13  20    the issues in this case relative to document altering.

21          THE COURT:  Well, my question is, there is no time

22    limitation on the warrant.  It's just, all e-mail in the Gmail

23    account.  And the position of the defendant with Orbit had

24    long terminated by the time this warrant was issued.  So I'm

11:08:34  25    trying to make sure of the legitimate law enforcement purpose

1    for that broad a search.

2              Now, you're saying that then you only were

3    interested in the e-mails that indicated the things listed in

4    Roman Numeral II, but you got them all.  They're all present.

11:08:52  5   And you didn't do anything in BIDMAS to filter out the

6    irrelevant information.  I presume you used BIDMAS to review

7    the relevant information because you don't have time to review

8    it all.  But nonetheless, you seized all of the information.

9              MR. HIRATA:  We did.

11:09:14 10            THE COURT:  So what's the legitimate law

11   enforcement purpose in doing that?

12             MR. HIRATA:  That is what -- that is what Gmail --

13   excuse me -- Google could provide.  They couldn't slice it up.

14   They provided us everything, and we narrowed our search

11:09:30 15  consistent with the scope in the four corners of the warrant.

16             THE COURT:  What do you mean you narrowed their

17   search?  They gave you everything.

18             MR. HIRATA:  We -- the united -- Google provided

19   the entire Kilgore Gmail account.

11:09:43 20            THE COURT:  Right.

21             MR. HIRATA:  Everything.

22             THE COURT:  Uh-huh (affirmative).

23             MR. HIRATA:  We took that information.  And again,

24   that information couldn't be segregated.  We took that

11:09:51 25  information and we conducted searches that were consistent

1    with the items, the issues that are identified in

2    Attachment B.

3              THE COURT:  Should there be a team to segregate the

4    responsive from nonresponsive material so you never have the

11:10:08  5    nonresponsive material?

6              MR. HIRATA:  No; because we weren't searching for

7    those materials.

8              THE COURT:  You weren't searching for what

9    materials?  Nonresponsive?

11:10:20  10              MR. HIRATA:  The nonresponsive materials.

11              THE COURT:  Well, you issued a warrant to Google

12    asking for responsive materials.  They give you an overbroad

13    response.  They deliver everything.

14              MR. HIRATA:  Because that's all they can provide.

11:10:33  15              THE COURT:  Shouldn't you honor the warrant before

16    your investigation team looks at the material provided by

17    Google, filter down all of the nonresponsive e-mails, the

18    e-mails about airline tickets and family birthdays and medical

19    information?  What entitles you under this warrant to possess

11:10:51  20    all of that?  What's the legitimate law enforcement purpose?

21              MR. HIRATA:  As to what you've just described,

22    there is none.

23              THE COURT:  But you have it, and it's in BIDMAS,

24    and it's not filtered out from your view; right?

11:11:03  25              MR. HIRATA:  That's correct.

1          THE COURT:  Okay.

2          Mr. Weiss, anything on that point?

3          MR. WEISS:  No, sir.

4          THE COURT:  Mr. Hirata, I think my last question

11:11:23  5  for you, are you relying in your case that we're going to

6  trial on in the middle of November on any material from the

7  Gmail account?  Any?

8          MR. HIRATA:  That's a difficult question to answer,

9  and let me tell you why.  The e-mails that Orbit counsel has

11:11:52  10  provided us includes e-mails from Mr. Kilgore -- from his

11  Orbit account to the Gmail account.

12          THE COURT:  Right.

13          MR. HIRATA:  Those same e-mails we have found,

14  again, based on our narrow searches, in the Gmail account.  So

11:12:07  15  in so far as those items are being referred to, yes, in that

16  context, we do intend.  There's an overlap.  Those are e-mails

17  that have been provided to us by the corporation.

18          THE COURT:  But you wouldn't need Gmail to have

19  those.  You would have them from Orbit.

11:12:31  20          MR. HIRATA:  That's right.

21          THE COURT:  So you're not independently relying on

22  anything from the Gmail account.

23          MR. HIRATA:  I don't believe so, Your Honor.

24          THE COURT:  Thanks.

11:12:41  25          A couple of questions for you, Mr. Weiss.  What

1    actual prejudice is shown here by the government's actions?  I

2    recognize that there are issues with the process that was

3    undertaken.  Mr. Hirata has frankly admitted to many of those.

4    But what prejudice has occurred to the defendant at this

11:13:07    5    point?

6          MR. WEISS:  I can give you one very dramatic

7    exemplar.  Hypothetically speaking, the client is unwilling to

8    communicate with us electronically anymore.  Even the

9    telephone conversation is of concern.  And it frankly concerns

11:13:29   10    me, as well.

11          THE COURT:  Thank you.  Do you see any benefit to

12    the prosecution, Mr. Weiss, by having had the possession of

13    the two CDs of Gmail?

14          MR. WEISS:  Well, I mean, I don't have anything

11:13:50   15    specific other than the opportunity.  And the opportunity --

16    and if this was one e-mail, if it was one question or one

17    response, but it's literally everything.  It's thoughts.  It's

18    strategic planning.  It's questions about.  It's our entire

19    format.  I will represent to the Court that this Gmail account

11:14:18   20    was opened at my direction so that we would have a

21    confidential place to communicate.  It's extraordinary.  I

22    don't know how to address it.  I've never seen anything like

23    this.

24          THE COURT:  Mr. Hirata, are there any ongoing

11:14:44   25    warrants for information in this case?

1          MR. HIRATA:  Search warrants?

2          THE COURT:  Yes.

3          MR. HIRATA:  No.

4          THE COURT:  Was the Gmail warrant the last warrant

11:14:58  5   issued with regard to this case?

6          MR. HIRATA:  Yes.

7          THE COURT:  And the grand jury finished its work in

8   October on this case; is that right?

9          MR. HIRATA:  That's correct.

11:15:08  10         THE COURT:  Of 2013.  And there has been no further

11   grand jury reconsideration for superseding indictment since

12   that time.

13         MR. HIRATA:  There actually has been a superseding

14   indictment.  And that, as you recall, Your Honor, was in

11:15:23  15   response to the motion to dismiss that was filed.  We

16   superceded by providing more detail about Kilgore's

17   involvement.

18         THE COURT:  Were there any grand jury subpoenas

19   issued with regard to that re-indictment?

11:15:36  20         MR. HIRATA:  No.

21         THE COURT:  Thank you.

22         MR. WEISS:  Your Honor, if I may?

23         THE COURT:  Yeah.

24         MR. WEISS:  Talking about your last question very

11:15:44  25   quickly.

1          THE COURT:  Yeah.

2          MR. WEISS:  I believe the government stated that

3    they, that these e-mails, e-mails that they obtained have

4    evidentiary value.  My work product was included in that, and

11:15:55  5    it seems to me that -- in those e-mails.

6          THE COURT:  Explain that to me again.

7          MR. WEISS:  Well, I mean, it's there.  It's

8    attorney-client privilege --

9          THE COURT:  Sure.

11:16:03  10         MR. WEISS:  -- communications and work product and

11   the opportunity to view that is the prejudice.

12         THE COURT:  Right.  You mentioned opportunity

13   before.  I agree with you there.

14         You know, it seems to me, Mr. Weiss, that the

11:16:19  15   problem here from your point of view is the case law.  The

16   case law, and I'm looking mostly at Shillinger because that's

17   the 10th Circuit case.  First, my first consideration is if

18   there's an intentional intrusion by the prosecution into the

19   attorney-client relationship.  And the Court noted that there

11:16:43  20   was a split of circuits at that time in 1995 about this.  But

21   the Court concluded that a prosecutor's intentional intrusion

22   into the attorney-client relationship constitutes a direct

23   interference with the Sixth Amendment rights of a defendant.

24   We hold that when the state becomes privy to confidential

11:17:05  25   communications because of its purposeful intrusion of the

1  attorney-client relationship and lacks a legitimate

2  justification for doing so, a prejudicial effect on the

3  reliability of the trial process must be presumed.

4       Now, and then after we get to that hurdle, which

11:17:28  5  we're going to talk about in a minute, the case goes on to

6  talk about the appropriate remedy.  And that's a separate

7  analysis.

8       But let's go to the first question of whether there

9  has been an intentional intrusion of the attorney-client

11:17:43 10  relationship.  Has that occurred in this case?

11       MR. WEISS:  Well, Your Honor, I can think of

12  nothing more intentional than obtaining this secret search

13  warrant.  And I think the government was hard-pressed to

14  articulate any legitimate purpose for that.  The intrusion

11:18:02 15  occurs when they get the warrant and they recognize by virtue

16  of the paragraph that addresses the fact that attorney-client

17  material is going to be present and that they are going to

18  establish some procedure.  That admits tactically or otherwise

19  that they acknowledge that they have no right to look at it.

11:18:24 20  So if there's an intentional intrusion with no purpose and

21  then the inadequacy of the procedure set up to review that

22  material simply exacerbates it.

23       THE COURT:  So let's get granular here.  You're

24  saying that the warrant obviously is an intentional act.  It

11:18:42 25  contemplates the intrusion into attorney-client material by

1    its own terms.  And then the failure to establish a taint team

2    in your view also reflects on that prong, that it becomes, the

3    intent becomes aggregated because they didn't follow the

4    procedure that they proposed.

11:19:02 5           MR. WEISS:  Yes, Your Honor.

6           THE COURT:  Okay.  Mr. Hirata, on this prong, has

7    there been an intentional intrusion in the attorney-client

8    relationship?

9           MR. HIRATA:  Absolutely not.

11:19:14 10          THE COURT:  Why not?

11          MR. HIRATA:  There's been no purposeful intrusion,

12   and that's what Shillinger requires the defense to establish

13   before a Sixth Amendment violation can be -- can occur.  And

14   there must be a deliberate, a purposeful intrusion.

11:19:33 15          THE COURT:  So why is it not if the warrant says,

16   we're going to be drag netting (sic) attorney-client

17   information.  We're going to set up a method to protect

18   against review, and then there's no tainting.  Why doesn't

19   that amount to an intentional intrusion?

11:19:49 20          MR. HIRATA:  Because intrusion means actually

21   accessing and looking at, coming into contact with privileged

22   information.  How do we know that?  We know that because we

23   have to look at the facts that underlie Shillinger vs.

24   Haworth.  We have to also under look -- excuse me -- look at

11:20:10 25   the facts that underlie Lin Lyn Trading, which is relied upon

                                                                    48

1    in the Shillinger decision.  If I may, Your Honor?

2              THE COURT:  Yeah.  Compare those for us.

3              MR. HIRATA:  So in Shillinger, what happened was

4    the defendant and his attorney desire to have discussions

11:20:30  5    together in an open courtroom.  And in order for that to

6    occur, a sheriff deputy needed to be present to monitor that

7    for safety, obvious safety reasons.  Meetings occurred.

8    Following those meetings, the prosecutor in the case on his

9    own initiative contacted the deputy and discussed the

11:20:58 10    substance of all of those communications that occurred between

11    the defendant and his counsel revealing among other things

12    trial strategy.  That's the type of deliberate intrusion that

13    Shillinger is about.

14              THE COURT:  So if the prosecutor acknowledged that

11:21:16 15    he was going into the relationship and exploring it.

16              MR. HIRATA:  That's correct.

17              THE COURT:  Okay.

18              MR. HIRATA:  Let's move on to Lin Lyn Trading.  The

19    facts in that case, what you had were two customs agents, one

11:21:29 20    in Portland because the defendant in that case was returning

21    from outside the United States, I believe it was Asia, into

22    Portland, and he was detained.  As part of that detention,

23    they took custody of his documents that he had with him.

24              In those documents was a yellow legal pad.  And on

11:21:52 25    that yellow legal pad were the notes of the defendant

49

1    concerning his communications with his attorney.

2         The Portland customs agent communicated with the

3    Salt Lake City customs agent who was working an investigation

4    in the Lyn Lin case, and copies of those records were taken

11:22:18  5    and provided to that case agent who looked at them, reviewed

6    them and as Judge Greene found in Lin Lyn, used that

7    information to further the investigation.

8         One thing that's significant about Lin Lyn, Your

9    Honor, even in the face of facts at least in my view are

11:22:40 10    egregious, Judge Greene dismissed the case.  When it went up

11    on appeal, the 10th Circuit said, no.  That is too drastic of

12    a remedy.  You need to consider less drastic remedies.  So the

13    matter was remanded back to Judge Greene for further

14    consideration for further proceedings.  But the 10th Circuit

11:23:08 15    said that the extreme remedy of dismissal was not warranted

16    and that the Court should have considered lesser sanctions.

17         Back to the issue of conduct.  So it's affirmative

18    conduct that the United States takes to deliberately knowing

19    that there's information out there that contains

11:23:32 20    attorney-client communications, in the case of Shillinger, a

21    sheriff deputy; in the case of Lin Lyn, a yellow legal pad;

22    where a prosecutor, an agent, whomever, knowingly accesses

23    that information, reads it, reviews it, relies on it and uses

24    it in shaping their case, in shaping their investigation, that

11:23:57 25    is a violation.  That's the sort of deliberate purposeful

1    intrusion that Shillinger requires.

2            And what we have here isn't even remotely close to

3    that because again, Judge, there is no actual access -- excuse

4    me -- actual review.  I don't want to mix the term access

11:24:21  5    because that's what Mr. Weiss has done.  He has conflated

6    access.  And if you look at his brief, he uses the term privy.

7    That's also taken from Shillinger.  He's conflated access and

8    privy to deliberate, purposeful intrusion.  Those are two

9    entirely separate things.  And if you look at the facts of

11:24:45 10    Shillinger, that is what well establishes that, the difference

11    between the two.  And to have simply access to as Ms. Arviso

12    had, as I had, has Mr. O'Donnell had, right, the possibility

13    of pulling a CD out of her folder, putting it into my

14    computer, deliberately pulling up those e-mails, looking at

11:25:08 15    communications between Mr. Weiss and his client, using those

16    e-mails to as they allege without basis in their motions to

17    shape my prosecution, our prosecution, United States'

18    prosecution, that's the sort of conduct that violates the

19    Sixth Amendment.  And there is nothing even remotely close to

11:25:31 20    that on the facts as we present to you in sworn declarations.

21            THE COURT:  I have talked to you before about the

22    legitimate law enforcement purpose, so I want to move on and

23    talk to you about the remedy.  Shillinger goes on to say that

24    cases involving Sixth Amendment deprivations are subject for

11:25:49 25    the general rule that remedy should be tailored to the injury

1    suffered from the constitutional violation.

2           We have request for two remedies in this case,

3    disqualification and dismissal.  I know you dispute the fact

4    that there had been a violation, that there has been an

5    intentional intrusion, but let's say I find one, that the

6    issuance of the warrant, that clearly acknowledged the

7    opportunity to have access to defense counsel communications

8    was an intentional intrusion.  Speak to the remedy.

9           MR. HIRATA:  Judge, if you look at Shillinger and

10   in particular on Page 1143, 70 F3d at 1143, it notes:

11          At the same time, such an intrusion could so

12   pervasively taint the entire proceeding that a District Court

13   might find it necessary to take greater steps to purge the

14   taint.  That is, suppression would be insufficient.  The Court

15   may, for instance, require a new trial by a new prosecutor.

16          So I suppose that is a potential remedy if and only

17   if, as the 10th Circuit notes, the intrusion so pervasively

18   tainted the entire proceeding, and again, Your Honor, with the

19   mere execution of the warrant, the mere access does not come

20   close to establishing that a pervasive taint of the entire

21   proceedings sufficient to warrant a wholesale disqualification

22   of the entire prosecution team.

23          THE COURT:  Thank you.

24          Mr. Weiss, I'd like to hear from you about the

25   appropriate remedy.

1          MR. WEISS:  Your Honor, thank you.  I would point

2    out that Agent Thompson and Agent Mortensen actually read some

3    of this and that they had privy to it, access to this

4    information for years.  Now, this is a circumstance with

11:28:16 5    electronic information in particular.  The vast amounts that

6    are here and with the computers available, this, we should not

7    have as a standard the government professing that they didn't

8    read it or that they didn't look at it or that they didn't use

9    it.  They have a simple, or maybe not so simple, but at least

11:28:37 10   an objective opportunity to set up rules and ways of dealing

11   with this information that removes the need to have to rely.

12   This is not a case where their good faith and their word is

13   involved in the decision, nor should it be.

14          It seems to me, Your Honor, that when Mortensen at

11:28:59 15   the very least sees and reads an interview and the questions

16   that go to the client with respect to that interview, that's a

17   taint.  It occurs right there.  It's real, and it's actual.

18   And it seeps for years through the entire case.

19          I think, Your Honor, that we see the volume of

11:29:22 20   information and the amount of information and the manner in

21   which it's transmitted and used and available growing

22   exponentially at a near light speed, and the government is

23   simply not keeping up with it.  If this was 1340 pieces of

24   paper or documents and they were in a box, it would have been

11:29:45 25   taped shut and it would have been handled.  But it was in this

1       vast virtual world of electronics.  And they have a

2       responsibility that they acknowledge they have no right to

3       intrude on to conduct themselves in a way that protects and

4       preserves, which I think is part of their oath, to keep that

11:30:12  5  opportunity, to keep that privy away, to keep the access

6       unavailable so we don't have them saying 50 times, I didn't

7       read it, I didn't look at it, Gee whiz, golly.

8               And the message needs to be sent to the government

9       that they need to follow protocols, they need to recognize

11:30:30  10  that these are issues of importance, not just criminally but

11      civilly to every trial lawyer and that they need to put into

12      place protocols that avoid the argument and the reasons that

13      we're here today.

14              Certainly exclusion of the entire team including

11:30:49  15  the agents who actually looked at the material is a minimum.

16      I think that dismissal, that the government needs to receive a

17      message and dismissal is the message here that ought to be

18      delivered.

19              THE COURT:  Thank you, Mr. Weiss and Mr. Hirata.  I

11:31:08  20  intend to rule from the bench on this.  I made sure we went

21      through the factual record.  I think that's adequately

22      established.  I intend to come back and state my ruling on the

23      record at 20 til, so we're in recess until 20 til.

24              (Recess. )

11:49:28  25  THE COURT:  We're convened again in

54

1    United States vs. Kilgore.   I appreciate the arguments of

2    counsel and your concise answers to my questions and the

3    information you've offered today.

4            I need to note for the record that we did set this

5    hearing on September 24th by a docket entry that date, which

6    set deadlines for briefing.  I noted this morning as I came in

7    that the Utah Association of Criminal Defense Lawyers filed a

8    motion to permit filing of an amicus position and filing of a

9    brief.  That was filed last night at 8 o'clock.  Because of

10   the timing, that motion is denied.

11           In this case I rely principally on the analysis

12   framework set up in Shillinger vs. Haworth, 70 F3d 1132.  And

13   I first examined whether there has been an intentional

14   intrusion into the attorney-client relationship.  In my view

15   in this case, there has not.  Intrusion implies actual view

16   and use, not the potential opportunity.  In the case

17   Shillinger and in the cases relied on in Shillinger there has

18   been actual use of attorney-client privileged information and

19   intrusion in the relationship.

20           Further in this case, I find that the intrusion

21   would not be intentional.  The warrant did not specifically

22   seek attorney-client information.  Indeed, no warrant would be

23   signed had it done so.  The warrant sought general information

24   and noted a process to avoid intrusion into the

25   attorney-client relationship.  There were problems with that

1    process, which I'll discuss.  But this does not rise to the

2    level of an intentional intrusion as the test in Shillinger

3    would require.

4           The process is troubling, and while the language of

11:51:31   5    the warrant would not require a taint team because there was

6    no search ever done of the culled or segregated e-mails, a

7    better process should have been outlined in the affidavit.

8           It's troubling that the agents in this case were

9    not screened from a dual function.  The same agents were

11:51:52  10    assigned to review and segregate for privilege as were

11    investigating.  This presents a danger of intrusion and is not

12    a wise process.  And, in fact, in this case, we have the

13    admission of Mortensen and Thompson that they viewed, though

14    they say they don't recall, the investigative report that

11:52:16  15    would have contained attorney-client information.  We have

16    only their indication that they do not recall it, the

17    substance of the interview or the name of the Orbit employee

18    interviewed.

19           There was no attorney supervision of the agent

11:52:36  20    review for privileged information.  In the civil setting, this

21    would mandate sanctions.  We do not trust legal decisions to

22    those who are not legally trained.  There was not adequate

23    attorney supervision of the screening process.  And while

24    defense counsel was designated in the case and it would have

11:53:10  25    been extremely easy to contact defense counsel to formulate

1    keywords to enable an effective attorney-client privilege

2    segregation, that was not done.  These are considerations

3    which should be considered in warrants.

4         Access to the entire Gmail delivery was not

11:53:35   5    adequately protected.  The CDs were widely available.  There

6    is no signal on the CDs that they contain or potentially

7    contain privileged information.  But because there was no

8    intentional intrusion to the attorney-client relation, that

9    first test in Shillinger has not been met.

11:53:59  10         There was some law enforcement purpose in the

11    warrant.  There was a legitimate law enforcement purpose in

12    obtaining access to the Gmail account.  But again, the warrant

13    was poorly designed.  It had far too long a term.  As the

14    information was provided from Google, it was not filtered in

11:54:20  15    response to the warrant, but it was, in fact, an overbroad

16    response, and no independent team was in place in the

17    investigative agency to ensure that only responsive

18    information was reviewed by the investigative team.  That's a

19    problem we have with the e-mail generally and with computer

11:54:41  20    searches generally that needs to be addressed by higher

21    courts.  But there's no ruling now that those failures of

22    process constitute an intentional intrusion.

23         Under Shillinger, the remedy characteristically

24    imposed if there had been an intentional intrusion is not to

11:55:00  25    dismiss the indictment, but to suppress the evidence, or if

1    evidence has been wrongfully admitted to order a new trial.

2    The government has stated its intention not to rely on any of

3    the Gmail evidence, making any remedy unnecessary.

4           Certainly this is not a case as Shillinger

11:55:24 5    suggested that it could exist where an intrusion would so

6    pervasively taint the entire proceeding that the District

7    Court might find it necessary to take greater steps such as

8    retrial by a new prosecutor, dismissal of the indictment.

9           In Shillinger, it's important to note the factual

11:55:43 10   record was not adequately laid, and so the case was remanded

11   for factfinding.  We don't have that problem here.  We went

12   through the facts in detail.

13          Therefore, the motion to dismiss is denied, and the

14   motion to disqualify is denied.  The minute entry will note

11:56:05 15   the denial of those two motions, and the transcript of this

16   hearing will serve as the record of the decision.  I will not

17   be preparing a written order.

18          Anything else that should be said, Mr. Weiss?

19          MR. WEISS:  I don't believe so, sir, no.

11:56:20 20          THE COURT:  Anything else that should be said to be

21   clear, Mr. Hirata?

22          MR. HIRATA:  No, Your Honor.

23          THE COURT:  Thank you.  I again appreciate your

24   assistance in resolving this important issue.  We're in

11:56:30 25   recess.
            (Whereupon, the court proceedings were concluded.)

1    STATE OF UTAH          )

2                           ) ss.

3    COUNTY OF SALT LAKE  )

4              I, KELLY BROWN HICKEN, do hereby certify that I am

5    a certified court reporter for the State of Utah;

6              That as such reporter, I attended the hearing of

7    the foregoing matter on October 8, 2015, and thereat reported

8    in Stenotype all of the testimony and proceedings had, and

9    caused said notes to be transcribed into typewriting; and the

10   foregoing pages number from 3 through 59 constitute a full,

11   true and correct report of the same.

12             That I am not of kin to any of the parties and have

13   no interest in the outcome of the matter;

14             And hereby set my hand and seal, this _____ day of

15   _____ 2015.

16

17

18

19

20             _____
                    KELLY BROWN HICKEN, CSR, RPR, RMR
21

22

23

24

25